File Name: 13a1027n.06

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

No. 12-4198

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| ROBERT LARICCIA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| COMMISSIONER OF SOCIAL SECURITY, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

**FILED**
Dec 13, 2013
DEBORAH S. HUNT, Clerk

**BEFORE: DAUGHTREY, COOK, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Robert LaRiccia appeals the district court's order affirming the Commissioner of Social Security's denial of disability insurance benefits under 42 U.S.C. §§ 416(i) and 423. We REVERSE and instruct the district court to REMAND the case for further consideration by the Commissioner.

**I. BACKGROUND**

LaRiccia was born in October 1962. He was honorably discharged from the Air Force in March 2001, after twenty years of service. On October 28, 2004, LaRiccia applied for benefits from the Veterans Administration (VA). The VA rated LaRiccia 100% disabled.

On August 7, 2006, LaRiccia applied for social security disability benefits, claiming a disability onset date of October 28, 2004, the effective date of his VA disability rating. LaRiccia alleged disability due to major depression, panic disorder, degenerative disc disease and associated

1

back pain, vertebral spondylosis and lumbar strain, neuromas in both feet, carpal- and cubital-tunnel syndrome in the right hand, medial meniscal derangement of the left knee, tendinitis of the right knee, right shoulder problems, gastroesophageal reflux disease (GERD), and Barrett's esophagus.

A.     **Treatment Records**

The administrative record contains medical records from 1999 through 2009, as well as the VA's 2005 disability assessment. Because LaRiccia was last insured for benefits on December 31, 2006, medical records after that date are relevant only to the extent they demonstrate that LaRiccia was disabled while insured. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) ("Evidence of disability obtained after the expiration of insured status is generally of little probative value.").

**1.**

Between 1998 and 2000, LaRiccia saw orthopedic surgeon Dr. Rogelio Naranja for issues with his shoulder and knees. In February 1999, Naranja performed a right-shoulder arthroscopic acromioplasty on LaRiccia, and on July 11, 2000, Naranja operated on LaRiccia's left knee. In December 2000, Naranja took note of LaRiccia's complaints of bilateral foot pain, which he ascribed to interdigital neuromas.

Dr. Karen Klingenberger was LaRiccia's primary care physician in 2001 and 2002. Klingenberger treated LaRiccia for an injury to his right wrist sustained in a May 2002 car accident. In July 2002, Dr. Klingenberger wrote a letter addressed "To Whom it May Concern," stating that the wrist injury, combined with suspected muscle tears/injury to his left shoulder, prevented LaRiccia from "resum[ing] his construction/work activities." She wrote a similar letter in November 2002. In October 2002, LaRiccia saw hand specialist, Dr. Troy Pierce. Dr. Pierce injected

cortisone into LaRiccia's right wrist and directed LaRiccia to work on grip strengthening and to wear a wrist splint.

In July 2004, LaRiccia saw orthopedic surgeon, Dr. William Seitz, for his right hand injuries. Seitz noted that LaRiccia demonstrated "signs of median nerve compression of the wrist, ulnar nerve compression at the elbow and TFCC tear with some arthritis of the distal radial ulnar joint." Dr. Seitz sent LaRiccia to occupational therapist Patricia Shimko for fabrication of a night-time resting splint, daytime splints for his elbow, warm soaks, and range-of-motion exercises. He prescribed "a short course of a Medrol Dosepak and some Bextra." In a second visit in April 2005, Dr. Seitz noted continuing "symptoms of median nerve compression at the wrist, ulnar nerve compression at the elbow and rotator cuff impingement with some AC joint arthritis and adhesive capsulitis." His impression was "significant ulnar neuropathy at the elbow with subluxation of the nerve over the medial epicondyle, compression of the median nerve at the wrist and progressive impingement, AC arthrosis and adhesive capsulitis." He recommended an ultrasound evaluation of LaRiccia's shoulder, exercises, warm soaks, splinting and Celebrex.

From 2003 to 2007, LaRiccia saw Dr. Kyle Wear at the VA outpatient clinic for primary care. At his initial visit on October 20, 2003, Dr. Wear assessed LaRiccia with hyperlipidemia, GERD with Barrett's Esophagus, chronic neck and back pain, and also noted that LaRiccia screened positive for depression. These diagnoses remained constant throughout Dr. Wear's treatment of LaRiccia. April 19, 2005 treatment notes include a diagnosis of right cubital tunnel syndrome and osteoarthritis. The April 14, 2005 and July 1, 2005 treatment notes show that LaRiccia did not screen positive for major depressive disorder but on September 5, 2006, Dr. Wear noted that an additional assessment indicated that LaRiccia met the criteria for major depressive disorder.

3

LaRiccia was examined by two consultative physicians and a physician assistant in connection with his VA and social-security benefits applications. Physician assistant Gerald Hopperton examined LaRiccia for the VA on April 5, 2005. He diagnosed LaRiccia with GERD, thyroiditis, chronic lumbosacral strain, chronic cervical strain, chronic sinusitis, depression, left and right foot neuromas, and residuals of injury to the left knee, right shoulder, and left knee. Hopperton opined that, due to neuromas and lumbosacral and cervical strain, LaRiccia should do only sedentary work and should sit for no more than 15 to 20 minutes at a time.

Dr. Irvine McQuarrie examined LaRiccia for the VA on April 14, 2005. He diagnosed LaRiccia with degenerative disc disease, hypercholesterolemia, depression, osteoarthritis, and obesity. He saw "no evidence (aside from symptoms) of cubital tunnel syndrome and no symptoms or signs of the previously diagnosed carpal tunnel syndrome." He noted "minimal signs of degenerative disc disease in both the cervical and lumbar spine on musculoskeletal examination, with confirmatory cervical MRI findings." "In summary," he found "mild degenerative disc disease of the cervical spine that is symptomatic whenever he has to look up, and low back pain that is likely a manifestation of early degenerative disc disease."

Dr. Sam Ghoubrial examined LaRiccia on October 10, 2006, in connection with LaRiccia's application for social security benefits. Ghoubrial noted a "[m]ild decreased [range of movement] to the LS spine," "[p]ositive tanels and phalens [sic] sign bilaterally," and a "[m]ild decreased [range of movement] to the left knee." He observed that LaRiccia was "able to get on and off the exam table without difficulty" and do heel-to-toe walking. Ghoubrial concluded: "Based on my evaluation of this claimant, I don't feel that he would have any difficulty sitting, walking, lifting, carrying, handling objects, hearing, speaking and traveling."

4

Two non-examining physicians reviewed LaRiccia's medical records to prepare physical functional capacity assessments. In October 2006, Dr. Willa Caldwell opined that LaRiccia could occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; stand and/or walk with normal breaks for about 6 hours in an 8-hour work day; sit without normal breaks for a total of 8 hours in an 8-hour work day; and push or pull with no limitations. In March 2007, Dr. Esberdado Villanueva reviewed LaRiccia's file and affirmed Caldwell's findings.

Examiners also assessed LaRiccia's mental health. Psychiatrist Monica Proctor examined LaRiccia for the VA on April 5, 2005. After reviewing LaRiccia's clinical chart and interviewing LaRiccia for an hour and a half, Proctor diagnosed LaRiccia with major depression, recurrent, severe; and panic disorder without agoraphobia; and assigned him a GAF score[1] of 50. In summary, she noted that:

> [O]ver time, he appears to be becoming increasingly bitter and angry to the point that he is less and less able to handle even minor stresses which would otherwise be under his control. With each added stress, he has become more anxious, bitter and depressed. His depression is currently rated as severe. In his current state he is felt to be unemployable. He has great difficulty with stress management, flexibility, concentration, and criticism. Although he has good intentions, he is so easily slighted that he would most likely have great difficulty accepting supervision and would most likely have periodic interpersonal difficulty with coworkers or supervisors. In his current state he seems to be 'spiraling out of control.' [LaRiccia], however is very insightful and motivated to be productive. With proper mental health intervention and treatment, it is possible that his condition would improve to the point that he may again be employable from a mental health standpoint. Without such treatment, his prognosis is felt to be poor and future employment would be doubtful.

In October 2006, psychologist James Sunbury evaluated LaRiccia in connection with his

---

[1]"GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Konecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006). A GAF score of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

application for social security benefits. Sunbury diagnosed LaRiccia with major depressive disorder, recurrent; and generalized anxiety disorder; and assigned LaRiccia a GAF score of 50. Sunbury found that,

> Considering psychological and social factors . . . [LaRiccia's] ability to relate to others, including fellow workers and supervisors is mildly limited due to anxiety and depression. His ability to understand and follow instructions is not limited. . . . His ability to maintain attention to perform simple repetitive tasks is mildly to moderately limited. His ability to withstand the stress and pressures associated with day to day work activity is moderately limited.

Non-examining psychologist Leslie Rudy prepared a psychiatric review technique form in October 2006, based on a review of the record. Rudy diagnosed LaRiccia with depression and generalized anxiety disorder and found LaRiccia moderately limited in his ability to maintain social functioning; maintain concentration, persistence, and pace; understand, remember and carry out detailed instructions; complete a normal workday and workweek; interact appropriately with the general public; accept instructions and respond to criticism from supervisors; and respond appropriately to changes in the work setting. Rudy opined that LaRiccia should not engage in work requiring frequent close interpersonal contact or close supervision, and that he would do best with a set schedule and flexibility to adjust his own routine to meet desired goals.

**2.**

The record also contains treatment records from several providers LaRiccia saw in 2007 or later, including Dr. Patricia Mullen, Dr. Gaurev Kapur, Dale Kaminski, Dr. Emad Douad, Dr. Iain Kalfas, and Dr. Andre Machado. Treatment notes indicate that each of these providers treated LaRiccia for injuries to his back, and associated leg pain, that he sustained after his last-insured date. Specifically, in November 2008, Mullen noted that LaRiccia reported that "shortly after his [first] visit here . . . he injured his back lifting furniture." Kapur, Kaminski, Daoud and Machado each

6

noted that LaRiccia presented with pain in his left buttock and leg that arose after LaRiccia spent a few hours moving lumber in early 2008.

## B.     Administrative Hearings

The Commissioner denied LaRiccia's application for disability insurance benefits on October 27, 2006, and, after reconsideration, on March 6, 2007.  LaRiccia requested an administrative hearing before an Adminstrative Law Judge (ALJ), and two hearings were held, one in April 2009 and one in July 2009.

LaRiccia appeared pro se at the first hearing and testified regarding his limitations and daily activities.  At the close of the hearing, the ALJ said he would likely request an additional consultative examination and schedule a supplemental hearing before reaching a decision.  In May 2009, the ALJ obtained a supplementary consultative physical examination from Dr. Dariush Saghafi and a supplementary opinion regarding LaRiccia's mental-health impairments from Dr. Sunbury.  Dr. Saghafi concluded that LaRiccia "likely as not suffers with a left sided L5 radiculopathy and clinically significant right foot neuroma." He opined that LaRiccia could "lift and push up to 50 lbs. but can only carry up to 15," and is "capable of seated types of work."  In a "Medical Source Statement of Ability to do Work-Related Activities," he checked boxes indicating that LaRiccia could sit, stand, or walk for 15 minutes without pain, and also that LaRiccia could only sit, stand, or walk for 15 minutes each in an 8-hour work day.

At the second hearing, LaRiccia appeared with counsel.  The ALJ took testimony from Vocational Expert (VE) Thomas Nimberger, Medical Expert (ME) Hershel Goren and LaRiccia. The ALJ posed the following hypothetical to the VE:

> I want you to consider a gentleman . . . with the following residual functional capacity; he could lift 10 pounds frequently, 20 pounds occasionally.  He could carry

10 pounds frequently, 20 pounds occasionally. He could push 10 pounds frequently, 20 pounds occasionally. He could pull 10 pounds frequently, 20 pounds occasionally. He could sit, stand and walk six hours in an eight-hour work day. As far as non-exertional limitations, the work should not be complex. There should be no mediation, no bargaining, no arbitration, no details, no graphs, no blueprints, no fine details. The work should be low stress. I want to define low stress. Low stress is low production quotas, which also includes no high production pace. No peace [sic] work. His social interaction with the public, the coworkers and supervisors should be minimized. As far as environmental limitations he should not be exposed to unprotected heights, and by that, I also include ladders, scaffolds, ropes. Should not be around moving machinery or hazards. In regard to postural or manipulation limitations there should be no frequent stooping bending.

The VE responded that there would be some work in northeast Ohio for that hypothetical individual, including as a mail clerk, cafeteria attendant, and office cleaner.

## C.    The ALJ's Decision

On August 12, 2009, the ALJ issued his decision denying LaRiccia benefits. Social Security regulations require the ALJ to follow a five-step sequential analysis when determining disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v).[2] In finding LaRiccia not disabled, the ALJ determined, at step one, that LaRiccia had not performed substantial gainful activity since his alleged onset date of October 28, 2004. At step two, the ALJ determined that through December 31, 2006, LaRiccia had

---

[2]We have summarized the five steps as follows:

The claimant must first show that she is not engaged in substantial gainful activity. Next, the claimant must demonstrate that she has a "severe impairment." A finding of "disabled" will be made at the third step if the claimant can then demonstrate that her impairment meets the durational requirement and "meets or equals a listed impairment." If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that she is incapable of performing work that she has done in the past. Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. The burden shifts to the Commissioner at this fifth step to establish the claimant's ability to do other work.

*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) (citations omitted).

the following severe impairments: right carpal-tunnel syndrome, chronic lumbar and cervical strain, and depression. At step three, the ALJ found that LaRiccia's impairments, taken individually or in combination, did not meet or medically equal a listed impairment. In reaching this conclusion with respect to LaRiccia's mental impairments, the ALJ found that LaRiccia had "mild restriction" in activities of daily living, "moderate difficulties" in social functioning, "moderate difficulties" in concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration. Between steps three and four, the ALJ assessed LaRiccia's residual functional capacity (RFC), and determined that LaRiccia had the capacity to

> perform light work as defined in 20 CFR 404.1567(b) except that the claimant is limited to low stress work (low production quotas and no piece work); minimal interaction with the general public, co-workers, and supervisors; and no complex tasks with no fine details. The claimant is restricted from unprotected heights, including ladders, ropes, and scaffolds; moving machinery; and hazards. The claimant is not to perform frequent stooping or bending.

At steps four and five, the ALJ determined that LaRiccia's limitations prevented him from returning to his past occupations, but that he could perform other positions that exist in sufficient numbers in the national economy.

The Appeals Council declined review, making the ALJ's decision the final decision of the Commissioner.[3] LaRiccia appealed to the district court, represented by counsel. LaRiccia argued (1) that the ALJ committed reversible error by not giving appropriate weight to the opinion of his treating physicians; and (2) that the ALJ erred by not recognizing his foot neuromas as a severe impairment. The district court affirmed the Commissioner's decision. LaRiccia now appeals pro se to this court.

---

[3]While his appeal to the Commissioner was pending, LaRiccia sought to amend his onset date to January 1, 2002. The Appeals Council did not respond, other than to decline review of the ALJ's decision.

9

## II. DISCUSSION

This court reviews the district court's decision in social security cases de novo. The court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### A.

LaRiccia raises three issues that he did not present to the district court. He argues that (1) the audio recording and transcript of his first hearing are missing eight minutes of testimony that would have demonstrated bias on the part of the ALJ; (2) the ALJ failed to provide reasons for his credibility determination; and (3) the ALJ should not have let LaRiccia represent himself at the first hearing. Because LaRiccia did not raise these issues below, they are forfeited. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 149 (6th Cir. 1990) (a social security claimant "cannot raise an issue before the court of appeals that was not raised before the district court.").

LaRiccia contends that his claim regarding the deficient transcript and audio recording should not be deemed forfeited because he discovered the deficiency only after the district court had issued its decision. But LaRiccia was aware of the ALJ's comments allegedly displaying bias at the time of the hearing; he raised them in a complaint filed with the Commissioner while the ALJ's decision was still pending. And, although LaRiccia did not have access to the audio recording before the district court decision, his attorney had a copy of the transcript. Accordingly, LaRiccia was not prevented from raising the bias or transcript-deficiency claims before the district court, and forfeited the claims by failing to do so.

LaRiccia also argues that the district court erred by entering into the record interrogatories

10

that were submitted to a vocational expert without including the VE's answers. But, aside from the unanswered interrogatories and a cover letter to the VE requesting that she answer them, nothing suggests that the VE *did* answer the interrogatories and that the answers were omitted from the record. Moreover, the district court had no reason to inquire, *sua sponte*, into whether answers to the interrogatories had been omitted from the record. To the extent LaRiccia charges the Commissioner with error for failing to include the answers in the record, LaRiccia waived the issue by failing to present it to the district court.

**B.**

LaRiccia also argues that the ALJ erred by failing to (1) consider or address the opinions of LaRiccia's treating physicians; (2) properly weigh and evaluate the record evidence concerning LaRiccia's mental health; and (3) afford weight to the VA determination that LaRiccia is 100% disabled.[4] We find merit in all three claims of error.

**1. Treating Physicians**

An ALJ is required to give controlling weight to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)" if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). This rule, often referred to as the treating-source rule, "is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into

---

[4]LaRiccia also argues that the district court erred by not reviewing the entire record to determine if the Commissioner's decision was based on substantial evidence. In support, he points to the district court's statement that it limited its "discussion of the evidence to only those records which are pertinent to the Court's analysis." LaRiccia misconstrues the statement. It describes what the district court *discussed* but not what it considered. As the sentence immediately following in the district court decision clarifies: "[T]he Court's overall review was not limited to these opinions."

11

the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). If the ALJ does not afford a treating source's opinion controlling weight, the ALJ must "must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p, 1996 WL 374188, at *4 (July 2, 1996).

The treating-source rule includes a procedural requirement that the ALJ "always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Failure to provide "good reasons" for rejecting the opinion of a treating source generally requires remand, even if "a different outcome on remand is unlikely." *Wilson*, 378 F.3d at 546. The requirement exists both to (1) "'let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied'"; and (2) to ensure that the ALJ applies the treating-source rule and that the ALJ's application of the rule can be meaningfully reviewed. *Id.* (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

LaRiccia contends that Naranja, Klingenberger, Seitz, Pierce, Shimko, Wear, Mullen, Kapur, and Daoud are treating sources, but this list is too inclusive. A treating physician is "your own

12

physician, psychologist, or other acceptable medical source who provides you, or has provided you with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Shimko and Kaminski cannot be treating sources because they are not "acceptable medical sources." *See* 20 C.F.R. § 404.1513(a) (listing "acceptable medical sources" and not including "occupational therapists" or "physical therapists" on that list); *Walters*, 127 F.3d at 530–31. Drs. Pierce, Seitz, and Kapur are treating physicians if LaRiccia had an "ongoing treatment relationship" with them, i.e., if LaRiccia saw them "with a frequency consistent with accepted medical practice" for the condition at issue. 20 C.F.R. § 404.1502; *see, e.g.*, *Barker*, 40 F.3d at 794 ("Dr. Ruff examined Mr. Barker on only one occasion, and the rationale of the treating physician doctrine simply does not apply here."). LaRiccia saw Drs. Naranja, Klingenberger, Wear, Mullen, and Daoud each numerous times; they are plainly treating physicians under the regulations.       LaRiccia is correct that the ALJ for the most part failed to specifically discuss the opinions provided by these physicians. The ALJ took note of Klingenberger's July 2002 letter opining that LaRiccia's hand and shoulder injuries prevented him from returning to his "construction/work activities," and dismissed it because it preceded LaRiccia's alleged onset date, but did not otherwise refer to Klingenberger's treatment records.[5] In the portion of his decision weighing LaRiccia's credibility, the ALJ noted the results of clinical tests performed by Daoud, but otherwise referred exclusively to conclusions drawn by non-treating physicians or other sources.

---

[5]Klingenberger's opinion that LaRiccia could not work is not a "medical opinion," i.e., an opinion "about the nature and severity of an individual's impairment(s)." SSR 96–2p. It is an opinion regarding whether LaRiccia is disabled, which is an issue reserved to the Commissioner. The ALJ must explain the consideration given to such opinions, but they are not entitled to controlling weight or special significance. SSR 96–5p, 1996 WL 374183 (July 2, 1996); *see also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) ("[N]o special significance will be given to opinions of disability, even if they come from a treating physician.") (internal quotations omitted).

Similarly, in the portion of his decision addressing the weight assigned to various medical opinions, the ALJ discussed only non-treating physicians or other sources. He assigned "greater weight" to opinions from Saghafi, Caldwell, Ghoubrial, and the ME, and assigned "less weight" to Hopperton's opinion that LaRiccia should perform only sedentary work and Saghafi's finding that LaRiccia could not sit, stand, or walk for more than 15 minutes in an 8-hour work day.[6] None of these are treating-source opinions. Caldwell and the ME conducted only file reviews; Saghafi, Ghoubrial, and Hopperton each examined LaRiccia only once; and Hopperton, as a physician assistant, is not an acceptable medical source. *See* 20 C.F.R. § 404.1513(a). The ALJ did not discuss the weight assigned to any medical opinions of Naranja, Klingenberger, Pierce, Seitz, Wear, Mullen, Kapur, or Daoud.

The ALJ's failure to address the opinions of the treating physicians warrants remand. The record was filled with treatment notes from doctors who LaRiccia saw regularly, showing that they had diagnosed and treated him for the conditions for which he claimed disability. The ALJ's failure to provide good reasons for disregarding their opinions could reasonably leave LaRiccia bewildered as to the basis for the disposition of his benefits application. *See Snell*, 177 F.3d at 134 ("The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable.").

2.    **Assessment of Mental Health Impairments**

---

[6]In declining to give weight to this portion of Saghafi's opinion, the ALJ found that it was "not supported by the examiner's objective findings, which showed a normal gait," and was also likely "based on the claimant's estimations which I find to be less than credible." LaRiccia contends that this was error because substantial evidence supports the limitation and the ALJ was mistaken in his credibility determination. We do not separately address the argument because we remand for reconsideration in light of the treating-source opinions.

14

LaRiccia contends that the ALJ erred when assessing the severity and effect of his depression by drawing inferences about his symptoms and their functional effects based on his failure to seek treatment in Ohio, without considering his explanation, and by failing to properly weigh the evidence more generally.

LaRiccia is correct that the ALJ erred by drawing negative inferences from LaRiccia's failure to seek treatment. Social Security Ruling 96–7p provides that

> the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996). The ALJ twice noted LaRiccia's failure to continue to pursue treatment when assessing the severity of his mental-health issues. First, when explaining his credibility determination, the ALJ noted, "[a]s to claimant's depression, he acknowledged that he receives Paxil from his primary care physician, but he does not go to regular counseling or treatment." Second, when explaining the significance he assigned to the GAF score of 50 that Proctor and Sunbury assigned LaRiccia, the ALJ noted,

> The GAF scores of 50 are at the milder end of the serious symptom range according to the DSM-IV. Based on a preponderance of the evidence, and considering the claimant's success with antidepressant medication *and lack of any further psychiatric treatment*, I find the GAF scores are insufficient to warrant any greater limitations.

The ALJ did not mention LaRiccia's explanation, reflected in his testimony, Sunbury and Proctor's assessment, and Mullen's treatment notes, that he discontinued treatment after moving to Ohio because no providers within his insurance network were available where he lives, and he is unable to drive long distances.

15

This error is significant. Relying on Proctor's statement that "[w]ith proper mental health intervention and treatment, it is possible that his condition would improve to the point that he may again be employable," the ALJ disregarded Proctor's assessment that LaRiccia was unemployable, has "great difficulty with stress management, flexibility, concentration, and criticism," "would most likely have great difficulty accepting supervision and . . . have periodic interpersonal difficulty with coworkers or supervisors," and "seems to be 'spiraling out of control.'" Proctor's evaluation resulted in a 70 percent VA rating for his depression, which, under in the VA system indicates, "occupational and social impairment, with deficiencies in most areas . . . due to such symptoms as . . . panic or depression affecting the ability to function independently, appropriately and effectively; [and] . . . difficulty adapting to stressful circumstances (including work or a worklike setting)." It is unclear whether, if the ALJ had acknowledged LaRiccia's reasons for failing to seek treatment, he would have accorded less significance to Proctor's statement that LaRiccia could improve with treatment and more weight to Proctor's assessment of LaRiccia's limitations. In addition, as LaRiccia notes, the ALJ also appears to have overlooked a significant finding by Proctor. The ALJ stated that "no medical source of record has opined that the claimant had more than moderate limitation in social functioning." But Proctor did. She stated expressly that LaRiccia "has serious symptoms including serious impairment of social and occupational functioning."

Because these errors cast doubt on the ALJ's consideration of Proctor's assessment—one of only two psychiatric assessments conducted prior to LaRiccia's last insured date—remand for reassessment of the severity and effect of LaRiccia's mental health impairments is warranted.

3.    **VA Disability Rating**

LaRiccia also argues that the ALJ erred by "not crediting or weighing" the VA's determination that he is 100% disabled. This court has not set forth a specific standard regarding

16

the weight the Commissioner should afford a 100% disability determination by the VA. *See Stewart*

*v. Heckler*, 730 F.2d 1065 (6th Cir. 1984) (noting in passing the claimant's VA 100% disability

rating). Social Security regulations provide that "a determination made by another agency that [a

claimant is] disabled or blind is not binding on [the Commissioner]." 20 C.F .R. § 404.1504. But

the Commissioner may nonetheless find an agency's determination relevant, depending on the

similarities between the rules and standards each agency applies to assess disability. *See* SSR

06–03p, 2006 WL 2329939, at *7 (August 9, 2006) ("[B]ecause other agencies may apply different

rules and standards than we do for determining whether an individual is disabled, this may limit the

relevance of a determination of disability made by another agency."). Regardless of the weight

afforded, an ALJ "should explain the consideration given to these decisions in the notice of

decision." *Id.*

> In this case, the ALJ addressed the VA disability rating as follows:

> While the claimant received a disability rating from the [VA] of 100% based on all
> of his conditions during service, not all of these conditions are deemed severe
> impairments in this case. Furthermore, the claimant's right carpal tunnel syndrome
> has only accounted for 10% of disability, as had the claimant's depression and
> lumbar strain. While the claimant's percentage for depression was increased to 70%,
> these percentages nevertheless support the ultimate conclusion that neither of these
> impairments are totally disabling in the Social Security disability context.
> Furthermore it is noted that a [VA] determination is not binding on this
> decisionmaker.

Although the ALJ provided reasons for the weight afforded the VA disability determination, as SSR

06–03p requires, we cannot credit the reasons because they do not accurately reflect the approaches

taken in the two systems. First, it is irrelevant that not all of LaRiccia's disabilities in the VA

system "are deemed severe impairments in this case." The VA rating reflects the cumulative effect

of all of LaRiccia's impairments, just as the ALJ's assessment of residual functional capacity reflects

a claimant's functional capacity in light of all of his limitations, not just those that are "severe." 20

17

C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,'. . . when we assess your residual functional capacity."). Accordingly, the ALJ erred by discounting the VA assessment because it included conditions not deemed severe in the social security context. Second, the ALJ's statement that the percentages assigned to LaRiccia's carpal-tunnel syndrome and depression in the VA system "support the ultimate conclusion that neither of these impairments are totally disabling in the Social Security disability context," appears to suggest that each condition considered by the VA must be totally disabling, standing alone, for the VA assessment to be relevant. If so, the statement is inaccurate. Disability in the social-security context "may result from multiple impairments, no one of which alone would constitute a full disability." *Loy v. Sec'y of Health & Human Servs.*, 901 F. 2d 1306, 1310 (6th Cir. 1990).

For these reasons, we REVERSE the district court's decision and direct that the district court REMAND to the Commissioner for reassessment of LaRiccia's application for benefits.